## The Administration of the Goods of DANIEL ANGEVINE.

A MARRIAGE established before the Surrogate, which had been solemnized under a false name on the part of the husband, and had been concealed by the husband from his relatives.

The Supreme Court, after ordering issues to be settled and tried at circuit, on an appeal from the Surrogate's decision in an administration proceeding, reversed its own order, as having been made without power, and ordered new trial before the Surrogate.

In obedience to this order, after four years spent in the appeal, the Surrogate placed the proceeding again on his contested calendar, for a new trial.

CHARLES CHENEY, *for Administrators.*
BENJ. J. BLANKMAN *and* A. G. FAY, *for Petitioner.*

THE SURROGATE. Levi Angevine, brother of the intestate, petitioned, on the 21st of March, 1864, for letters of administration upon the goods and chattels of Daniel Angevine, deceased, setting forth the intestacy; that the next of kin of deceased were his mother, brothers, sisters, nephews and nieces; and that deceased was never mar-

ried. He prayed to have Nelson Duckworth associated with him in the administration; and, upon their filing the statutory bond, letters were accordingly issued to both, as administrators, on the same day.

On the 6th October, 1864, Ann Angevine presented her petition, setting forth that she was the widow of Daniel Angevine, deceased; that the decedent left surviving him three minor children; that she had had no notice of the former application for administration, and had never renounced her right to administer; and praying that the letters to Levi Angevine and Nelson Duckworth be revoked, and that letters be granted to the petitioner.

Upon this petition the administrators were ordered to show cause why their letters should not be revoked, and they were enjoined from acting as administrators until further order.

The respondents denied that Ann Angevine, the petitioner, is or ever was the widow of the intestate, or that the children named in the last petition were the children of the intestate.

The following testimony was taken in the matter, from May 17th to July 13, 1865:

Ann Angevine, the petitioner, testified that she was thirty-nine years of age; she had been acquainted with the deceased intestate since he occupied a store corner of Spring and Elm streets; could not give exactly the date; she was married to the intestate by a marriage ceremony performed by Rev. Mr. O'Haren, on the 16th of December, 1849, in his house, in Twenty-fourth street; there was another young lady present, a witness to the marriage, who has since got married and gone to Australia; the maiden name of petitioner was Ann McFarlan; the decedent married her by the name of James Young; she knew him, also, subsequently, by the name of David Jones; of this marriage there have been four children born alive and four still-born; three are living now;

Annie Elizabeth, eight years old; Ida Frances, six years old; and Phebe, four years old; witness saw her husband for the last time alive on a Saturday; she has heard that he died on Sunday, the next day; she saw him after his death.

On cross-examination, this witness testifies that she was born in Ireland and came to this country when about thirteen years of age; she went into domestic service at once, in Bedford street, with a family named Parks; lived there a year; went then into a family named Wynkoop, in Bleecker street; the head of that family was a clergyman; she lived there two years. She was then taken sick with a fever, and was six months boarding in the family of one McLaughlin, a blacksmith, in King street. When she recovered, she lived in the family of a Mr. Pennoyer, a flour commission dealer in Twenty-first street, where she stayed three years. She lived there when she was married to the decedent, Angevine. She first met Angevine when she was living with the Parks family in Bedford street, and when she was a girl of thirteen or fourteen. There was a young man named Dagan, who was a friend of the decedent, and a brother of a fellow servant of this witness. Dagan brought decedent to the kitchen of Mr. Parks' house, and made him acquainted with the witness. This was some nine or ten years, perhaps, before the marriage. The decedent continued to visit the witness, at the different houses in which she lived, from that time onward, calling generally on Sundays, and she receiving him generally in the kitchen. Dagan had introduced the decedent as James Young, and by that name the witness continued to know him.

It was while she lived in Mr. Pennoyer's family that she was married, in December, 1849, on a Sunday evening. Angevine, *alias* Young, had only proposed marriage to her about a month before, though he had known and visited her for ten years. He wished the marriage to be kept secret from his family, as "he said that his sister,

who lived with his mother, was kind of cross and ugly, and he did not want to raise her temper; did not want to get her angry." Accordingly, the witness kept it secret. From the marriage ceremony, witness went back to her duties in Mr. Pennoyer's house. But she left her place the next day, and went to service at Mr. Becker's, where she remained for five years. During all this time she did not cohabit with the decedent; "he came to see her just the same as if they were not married." It was only when she finally left service and "went to housekeeping" in Fourth street, that she began to cohabit with him.

The reason she gives for their not living together for the five years immediately succeeding the marriage, is that her husband wanted her to go to board and that she would not, because she wanted to keep house. She only found out that such was his wish after the ceremony had been performed, and it was in consequence of this disagreement that they never lived together, until he yielded the point, when the apartments in Fourth street were hired, and she finally left service at Becker's. While she was still at Mr. Becker's, on one Sunday, the petitioner and her husband were riding in a street car, and she heard him addressed by somebody as Mr. Angevine. But she does not remember that she then told Mrs. Becker that her husband's name was Angevine; though it seems likely that she did.

When they began to live together he used to come to her apartments pretty nearly every evening, and remain all night for two or three nights in a week. He stated to her that he slept in his store on the nights when he did not stay with her all night.

After Mr. and Mrs. James Young at last began cohabiting as man and wife, she says they lived in Fourth street for a year; then moved to Eighth street, and then to Willet street. It was while they lived in Willet street that a grocer in the neighborhood, with whom she dealt, told her that the name of her husband was not Young.

This grocer wrote his own name on a card and also her husband's name, and gave the card to her. She gave the card to decedent that evening, when he came home. He was angry, but acknowledged that his name was Angevine. He said he was in partnership with his brother and "did not want his name known for a little while yet." He then said he should take the name of David Jones; and he did thereafter go by this name, and she by that of Mrs. Jones, for some years. They moved from Willet to Dominick street; thence to Vandam street (where they lived five years); thence to Nineteenth street; thence to Clarkson street, and thence to South Seventh street, Williamsburgh, where her husband resumed the name of James Young, and she that of Mrs. Young. There they were living under these names at the time of Angevine's death.

There is some confusion in the witness' testimony as to the time when she learned her husband's name was Angevine. She says it was about three years after she was married to him; but it was seven years after her marriage that she went to live in Willet street.

The marriage record book of the Methodist Church in Thirtieth street shows the marriage of "Mr. James Young to Miss Ann McFarlan, both of New York city, Sunday, Dec. 16, 1849, at my residence, E. O'Haren." There are also put in evidence physician's bills against "Mr. Young" and "David Jones," incurred by the petitioner in her confinements, and paid by the decedent. Also, the register of the baptism in Trinity Church, New York, of "Annie Elizabeth and Ida, daughters of David and Ann Jones," and of the baptism in St. Luke's Church, New York, of "Phebe, daughter of David and Ann Jones."

The witness states that the premises occupied by her were hired by her, and the rent paid by her, except that, sometimes, if the decedent was in the house, he would pay it. He sent household stores home from his own store, "flour and all such things as he kept in the store

that I wanted, and when he didn't have it, he got it from the stores down town, such as sugars and teas, and from the butcher. He always brought the meat home. I always had plenty. No matter what I wanted, I got it. It was his porter that brought flour to my house in his own wagon."

The expenses of her household and of her children, and their clothing, etc., the witness thinks must have exceeded $500 a year; but she never kept any accounts.

The witness further says that upon something having been said or written in a letter against her by another woman, her husband sent her to the clergyman, about two years before his death, for a copy of the marriage record, for the purpose of having this woman "brought before the law." She also states that her husband had in his pocket, when she last saw him, a paper which he stated was his will, and in which he said "he had shown her to be his lawful wife," etc. She did not read it, for she cannot read writing.

She states that during all his matrimonial connection he made no secret of coming to see her; came in the day time, dressed as usual; was present at the baptism of one child; ate at her rooms; went out with her to church, to the theatres and museum, to the parks; rode with her in street cars, and walked in the streets arm and arm, etc. She told her friends and neighbors that she was married, and always passed as a married woman at the places where she lived. On the other hand, the decedent said to her that he slept in his store so that "his folks" would not know that he was married, and he always gave the same excuse—fear of his family—for not letting his own relatives know of his marriage. "Towards the latter part of his life, he said he would tell it. If he had lived to come home," the witness believes, "he would have" done so.

The witness saw Daniel Angevine alive for the last time on the Saturday before his death, when he came over to Williamsburgh, about ten or half-past ten in the morning, to her house. She heard of his death on the next

Tuesday morning, by hearing it in the newspaper. She went up to Tarrytown and rang the bell at the house of the mother of the decedent. A lady came and the asked to see the corpse, and was taken into the parlor where it was lying, and there was his sister, as she judges; there were four ladies there. Her little girl, Annie Elizabeth, was with her. They asked witness who she was. She told them they would know by and by, who she was. They asked the girl who was in the coffin, and the girl said it was her father. The lady said again, "Is that your father?" and she said, "Yes, ma'm, that is my father." Then the lady asked witness, and she replied, "Yes, that is my husband." His brother then came in. "I asked him if he supposed I would be left without any means of support, for I didn't suppose I had ten dollars in my possession. He asked me if that was my husband and I said 'yes.' He said he knew nothing about it."

Such is the testimony of the petitioner, and I have been very considerably impressed with its peculiar features and strange developments.

Julia Lymes testified that she knew the petitioner and her husband, when they lived in Vandam street, by the name of Jones, and subsequently at Williamsburgh. She states that the husband acknowledged to her his name to be Daniel Angevine; this was in his store, No. 218 Washington street. She states that the decedent was kind and affectionate in his family; that the children called him "papa;" that she saw him and the petitioner go in and out together.

Margaret Lymes and Jane Collins prove his affectionate conduct towards the petitioner and her children.

William Becker testified that while the petitioner lived as a servant in his house, for four or five years, she was known to be a married woman, and bore a good character.

Rev. Samuel M. Haskins testifies that the petitioner is a communicant of his church in Williamsburgh; she joined it by a letter of introduction from the rector of

THE ADMINISTRATION OF THE GOODS OF DANIEL ANGEVINE.

St. Luke's Church, New York, by the name of Ann Jones. Never saw Mrs. Jones' husband.

Dr. J. W. G. Clements (who attended the petitioner, professionally), and Eliza Conner, testify as to the petitioner's husband's kindness and attention to her, and his personal appearance, and the resemblance of the children in court to him. They knew him as Jones.

Dr. John A. Brady, who attended the petitioner, under the name of Mrs. Young, and her family, was called in by Mr. "Young" himself. He testifies that there was a suspicion in the neighborhood where they lived in Williamsburgh, that they were not married. Dr. Brady names Mrs. Aarons as a person who mentioned these suspicions to him.

Mrs. Becker testifies that the petitioner came to live with her in 1849, as a servant; that she then said she was married, and that her name was Young. She assumed the name of Jones afterwards. She said her maiden name was McFarlan. She told Mrs. Becker her husband's real name was Angevine, and she said her husband did not come to see her because he was afraid he should see Mr. Becker, as he knew him. She was a good woman. When she left Mrs. Becker, she said she was going to live with her husband.

Mrs. Teresa Ann Aarons testifies that she "never heard nothing at all" about suspicions that Young and the petitioner were not married.

Upon the side of the contestants the first witness was Mary Bhur, who lived in the house, 40 South Seventh street, Williamsburgh, with the petitioner. She testifies that the petitioner told her she was not married to the man who came to see her, but that she was going to marry him. The children called him "father."

Levi Angevine, brother of the decedent, testifies that the decedent associated with the various members of his family the same as others, and used to go home to his mother's at Tarrytown quite often. The witness never

had the least hint that decedent was married; never thought of such a thing. The decedent was in business from 1835 to 1839, keeping a retail grocery, corner of Spring and Marion streets; in 1840, he and witness went into partnership together. Decedent never kept on the corner of Spring and Elm. From 1848, the decedent and witness kept a flour store, under the name of "Daniel Angevine," at 218 Washington street, till his death. Witness never saw the petitioner before his brother's death. The decedent never took any flour from the store, to the knowledge of the witness. In 1847, the decedent boarded with witness in Columbia street; he was always punctual to the house at nights. In the spring of 1848, he boarded with witness in Charlton street; that year he was always home at his house, regularly, every night; went home with the witness from the store and remained home. In 1849, both removed to Barrow street, and decedent remained there till May, 1850. His habits that year were to go home with this witness from the store at night, and remain in the house; always punctual. He did not board with witness after May 1, 1850. He took a room in Harris' hotel, and ate his meals wherever convenient; he remained there one year. Then he took a room (in 1851) with Mr. Carpenter, in Harrison street; kept his room there till 1861. In that year he hired a room in Harrison street, near Greenwich street, where he was for a year and a half. Thence he went to the corner of College Place and Barclay street, where he lived till his death. The witness was never at any of these rooms except once to one of the rooms in Harrison street, and don't know where he kept his clothes or how his washing was done. The decedent opened the store at five o'clock in the morning in summer, and at seven in winter, and closed it at five, six or half-past six in the afternoon. He had no bed in the store. The witness showed by the books of the firm the amounts drawn out by the decedent from 1854 to 1864 inclusive, varying from $500 to $1,050 a year.

Decedent and witness owned, together, two houses in Williamsburgh, the rents of which were paid into the firm. He had no money, property, or assets, outside the firm. No will has been found. Nothing relating to marriage. Nothing concerning any separate property. The witness saw decedent on the Saturday before his death, at his store, at half-past eight, about half-past nine, where he remained till eleven, when he went on 'change, and when he got back he made entries in the books of purchases, and left the store between half-past twelve and one o'clock. This witness swears that both Mr. and Mrs. Becker told him that the petitioner left their service to get married. The decedent was on good terms with his family and very affectionate. The decedent died at Tarrytown on Monday morning.

On cross-examination, this witness says that, after the decedent ceased to live with him, he knew nothing of his doings after he left the store at night till he saw him the next morning. The witness was called upon by Mr. Fay soon after his brother's death (and before applying for administration), who asked witness if he knew that Daniel had a wife, but the witness don't remember that Fay then showed him a certificate of marriage. Witness saw the petitioner at his mother's house at Tarrytown, when his brother was lying there dead. She did not say in witness' hearing that Daniel Angevine, then lying dead, was her husband. Witness don't remember that he said anything to her. Petitioner said to him, at that time, "If you will give me ten dollars until I can better myself, I will go home and say no more about it." Witness did not hear of such a thing as that the child that was there with her was the child of his brother. When the petitioner came to the house that day, witness' sister Charlotte asked her if she ever went by any other name than Ann Young or McFarlan, and petitioner told her "no." She then said, "Then you wash for him?" and petitioner said "Yes, I do." Charlotte said, "Yes, I thought you were his

washer-woman." Petitioner then made the remark previously testified to, that if this witness would give her ten dollars, till she could go home and better herself, she would say no more about it. That was all the conversation witness remembers. Petitioner did not attend the funeral. Witness has never received from his sister Frances the papers which were found upon decedent's person at his death. The witness, upon further cross-examination, recollects that at the interview at Tarrytown, the witness' sister Charlotte asked petitioner for her name, and she answered her, "Young." He did not answer her when she spoke to him of the ten dollars. Witness was not there when she came. Witness' wife had told him, out in the yard, that petitioner had claimed his brother to be her husband, and he said, "let us go in the house and see her." He was curious to see the woman. He did not speak to her.

Frances Angevine, sister of decedent, testifies that decedent came to Tarrytown on Saturday afternoon, not in good health, and was found dead, at two o'clock Monday morning, in his bed. Never had any reason to suspect he was married. Decedent visited his mother every week or two; he has been home a week at a time; he was sick, one time, and came home and stayed. The witness came in the house of her mother while the petitioner was there, and her sister told her that that woman said she was brother Daniel's wife; "they said that she was his washer-woman, and there was something said about his linen that he had throwed off; I forget what way it came around; but I had asked him (decedent) for his linen, and he had told me he gave it to his washer-woman; and she spoke of that; this woman spoke of that, that day. She said she told brother Daniel that he must buy some muslin and bring it to her; and then I told her to get out of the house as quick as she could get out." That is all this witness recollected. Witness found no papers on his person like a will, or relating to marriage. Decedent had

paid attention to a lady in 1854, a respectable lady, moving in witness' circle.

On cross-examination this witness says, she don't know that she was angry at the petitioner when she came there. Her "feelings were very much hurt, at such a time as that, when her brother could ·not speak for himself, for a woman like her to come—it was too much." Witness did say, "Could my sister get her away from the house and not let me *knowed* it ?" The petitioner acted very civil. Witness ordered her out because she thought it was no place for her to come to on such business as that. "A woman we never had *knowed* or heard of, nor never had seen." Witness ordered her out because she did not want her there, and considered it polite, lady-like and civil to order her out. Witness don't think it was a grievous thing to the woman and girl; ·it was a grievous thing to this witness to have such a thing as that come up about a kind brother and a respectable man, as he was. Decedent did not respect that woman, and witness don't believe he would have married a woman he did not respect. Petitioner went at witness' bidding. She said she would go ; that she knew there would be just such a time. There was no consultation among members of the family about ordering the petitioner out of the house.

Henry Bush testifies he knew Mrs. Jones, the petitioner, and that he took two letters for her to Daniel Angevine, who took them and said nothing.

Nelson Duckworth testifies that he was very intimate with the decedent, and never understood that he was married. He testified that Mr. Becker told him he had never supposed the petitioner to be married while she lived with him,. for the reason that, when she left, she left for the purpose of getting married.

William G. Angevine, nephew of decedent, testifies that he saw the decedent in the morning of the Saturday before his death, when they opened the store, probably between five and six o'clock ; could not say where he

breakfasted; saw him a little after ten; he went on 'change about eleven, saw him between twelve and one. The petitioner had said to this witness that she was married to Daniel Angevine by the name of Jones. " She showed no more signs of being grieved at his death than any man coming in to buy a barrel of cider, or eggs. She looked as fair and fresh as anybody."

Robert L. Waters, clerk in the store of D. & L. Angevine, corroborates the statements as to decedent's occupations and engagements all Saturday morning.

Mary J. Cash, sister-in-law of Levi Angevine, testifies that she resided with Levi and decedent in 1848, in Charlton street, and in 1849, in Barrow street; the decedent came home regularly at six or seven o'clock in the evening during those years, and stayed home, not going out after supper; he retired at nine o'clock; never understood that he was married; witness generally saw him at breakfast, between six and seven in the morning.

Jane Penniman testifies that in 1866 she lived at No. 6 Harrison street, and in October the decedent took an attic room in her house and was there, she thinks, a year and a half; he came there from Mr. Carpenter's, where he had lodged; he was very regular in his habits, invariably coming in before ten o'clock, and he left very early in the morning; he left, at times, on Friday morning and came back on Monday, and said he was out of town at his mother's. Witness don't know where he got his washing done; his clothes were not sent or brought home; he took no meals in her house; no friends came to his room; he left to go and live at the Sewell House, College Place and Barclay street; witness supposed him to be a bachelor; he was very quiet, retired, neat, not communicative; he had his outer clothes in his room, but no linen.

Mary Striker testifies that she kept house for Mr. Carpenter when decedent lodged there, for almost five years; he had an attic room there from 1855 till he went to Mrs. Penniman's; he was very regular, and came in

about nine o'clock at night; the bed appeared as if he had slept in it; he would often go away on Saturday to his mother's, at Tarrytown, and return Monday; never heard a word about his being a married man; don't know anything about his washing; he took his clothes and fetched his clothes.

John Gakin testifies that he let to petitioner, by the name of Mrs. David Jones, the house 40 Clarkson street; some of the people about there did not give her a good character, he thinks they said, "there was a good deal of beer went in there every day;" never found any disorder when witness went there.

Gilbert S. Keys testifies that Mrs. Becker had told him that petitioner left her house to get married, and that the only name she knew her under until she left her house was the name of Ann McFarlan.

Harriet Angevine, wife of Levi Angevine, testifies that she first saw the petitioner at Tarrytown; witness let her into the house, and petitioner first asked: "Is the corpse gone?" Witness said no, and asked her into the back room and offered her a chair; petitioner did not sit down, but said: "Can I see the corpse?" Witness said: "Will you give me your name?" She said: "Ask me no questions;" a cousin, who was there, started to take her to see the corpse, and witness asked again: "Will you please give me your name?" She replied: "Ask me no questions now." Witness followed her into the room, and saw her when she came out; when she came out into the back room, she stated that she was married to somebody; that she married a man (not saying what his name was), and telling a number of places where she had lived; witness remembers the names of Pennoyer and Becker; petitioner then said that when she lived at Mrs. Becker's she first became acquainted with the man she married; that he visited her there in the basement, and when she left there, she had left to get married; witness asked her questions as to this marriage, and petitioner said she was married

in Twenty-first street, by an Episcopal minister named Havens; but afterwards said she was married in Twenty-fourth street, in a little church near Ninth avenue, that afterwards burned down; she said that after she was married, her husband came to her house every night, except once in a while; witness' sister said: "That cannot be so, for sometimes he went out West, and stayed a month; Mr. Carpenter's folks have told me that my brother was never away any time except when he went into the country, once in a while; and that he was home every night in his room by ten o'clock, or before." Petitioner said: "I never said he staid at my house nights; he always left my house at nine o'clock, never later than a quarter past nine o'clock." Witness said: "Do you know who done his washing?" She answered: "I did it." Then Charlotte said: "I thought you were his washerwoman." Something else was then said in regard to his clothing; witness asked if she had a marriage certificate, as that would tell whether she was married or not; petitioner said: "I may as well tell the truth, I was married to him under a false name." Witness asked: "What was the name?" Petitioner said: "James Young." Then one of the sisters said: "Did you ever go by any other name than Ann McFarlan, or Young?" She said: "I never went by any other." Petitioner did not seem to be moved at all to tears; she kissed the corpse, but did not seem affected; the child said: "My father," but did not cry, but looked up and smiled; the petitioner said she did not know her husband's real name till two or three years before he died; that then a man met him on the stairs and said: "Hallo, Angevine, are you there?" And that when he came in the room, she (petitioner), said: "What name did he call you?" And he said: "It is not any one you know;" but she said that afterwards she learned his name; petitioner saw Levi Angevine in the hall; she said, first to witness: "I have but five dollars in my pocket, that he gave me Friday night." Then she

turned and said to Levi Angevine : " Mr. Levi, if you will give me ten dollars, that I can get a room and put my children in, I will go home and say no more about it, and go at my old work washing." He replied : " Madam, I don't know you." Witness had never heard or suspected that decedent was married; he said he did not think he would ever get married.

Henry Carpenter testifies that the decedent occupied a room in his house from 1851 to 1861, that he almost always came home at nine in the evening, and sometimes went out of town over Sunday.

Charlotte Foshay, sister of decedent, testifies that she saw petitioner at her mother's house after his death. When she came in she asked, " Is the corpse gone?" Witness thought it was some friend who had seen the death in the newspapers and had come up to see. Mrs. Levi Angevine and a cousin, walked through into the room with her. Witness did not go in at once. The cousin came out and said, " That woman that is here is Daniel's wife." Petitioner said that was her husband, but mentioned no name. Witness then went in. Petitioner stayed there, as any strangers would that had come in, looking at the corpse. The petitioner had the same look on her countenance she now has. She said her name had been Ann McFarlan, till she left Mrs. Becker's. Witness don't remember where she said she had then gone, but she went to get married, and was married by the name of Young, and she always went by those two names. Witness asked her if she was any relation of the McFarlanes in Christopher street. She said she was not. Witness said, " You are Irish?" She said, " I am Irish." Witness asked if petitioner did the washing of decedent. She said, " Yes, she did." Witness said, " I supposed you were his washer-woman." The witness had before asked the decedent what he did with his cast-off linen, and he had said he gave it to his washer-woman. This was why witness supposed petitioner to be the washer-woman. Wit-

ness did not hear her say that that was her husband lying there dead. Witness swears that the petitioner and her child were both laughing; "don't know whether you call it laughing or crying; she had just the same countenance now she had than." The witness "hopes she is a child of God," and is telling the truth. Witness thinks the conduct of the petitioner was not quiet and lady-like; did not see anything out of the way, only witness "thought she appeared very different from what a great many would suppose her to appear. If she had come in as she ought to have come in, it would have looked a great deal better, and not in the manner she did." Witness don't know that there was anything about the conduct of the petitioner, except her manner when she came in, which was, that she asked "if the corpse was gone?"

Upon the evidence the Surrogate in this matter decided to revoke the letters of administration issued to Levi Angevine and Nelson Duckworth, on the ground that Ann Angevine was the widow of the intestate. A decree was made and entered in the Surrogate's Court, October 20, 1865, as follows :

"And the Surrogate doth find and adjudge that the said Ann Angevine is the widow of the said Daniel Angevine, deceased, and as such widow is entitled to letters of administration of all and singular the goods, chattels and credits of the said Daniel Angevine, deceased.

"And it is ordered, adjudged and decreed, and the said Surrogate, by virtue of the power and authority in him vested, doth order, adjudge and decree, that the said letters of administration of all and singular the goods, chattels and credits of the said Daniel Angevine, deceased, heretofore granted and issued to said Levi Angevine and Nelson Duckworth be, and the same are hereby revoked and annulled; and all authority and right of the said Levi Angevine and Nelson Duckworth are hereupon to cease;

and that such letters of administration issue to the said Ann Angevine, on her giving a bond with sureties in the usual form according to law."

From this decree Levi Angevine and Nelson Duckworth appealed on the 30th October, 1865, to the Supreme Court. The appeal, however, did not stay the revocation of their letters, nor the issue of the new letters of administration to Mrs. Angevine. (See 3 *R. S.*, *5th ed.*, *p.* 907, § 34, 116).

The appeal from the Surrogate's decree came on to be heard before the General Term of the Supreme Court, and an order was made by it on the 19th day of June, 1867, whereby it was "ordered and adjudged that the decree of the Surrogate be reversed, and that issues be made up at a Special Term of the Supreme Court to try the questions thereon arising at the Circuit."

On the 2d July, 1867, issues were settled at Special Term, and the action ordered to be placed on the day Calendar of part 3 of the Circuit, for trial on the first Monday of October then next. But no trial having been had, the issues were re-settled on the 28th day of March, 1868, at another Special Term.

About this time it was discovered by the Supreme Court that it had had no statutory power to send to the Circuit for trial issues arising before the Surrogate, in a proceeding other than one for probate. This discovery resulted in an order, made and entered at a General Term of the Supreme Court on the 2d of February, 1869, whereby it is recited that "it appearing that the General Term has no power on reversal to direct the issues aforesaid, it is ordered that the judgment of reversal of the General Term aforesaid be, and the same is hereby amended so as to reverse the said decree of the Surrogate, and order a new trial of the proceeding before him, and that so much of the said judgment of reversal as directs issues, and the orders of the Special Term, settling and resettling such issues, and ordering the cause to

be placed on the Circuit calendar, be, and the same are, hereby reversed."

It appears, therefore, that after four years of consideration of this proceeding, the Supreme Court, has remitted it to the jurisdiction of the Surrogate's Court, and ordered the Surrogate to try and decide it anew:

The proceeding will be placed on the contested calendar, for a new trial.